UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| VINCENT THEODORE RAMOS,<br><br>Plaintiff,<br><br>v.<br><br>WILLIAM FLINT,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 1:24CV700 |

MEMORANDUM OPINION AND ORDER
OF UNITED STATES MAGISTRATE JUDGE

This is a *pro se* civil rights action filed under 42 U.S.C. § 1983 by Vincent Ramos. Plaintiff brings claims against Defendant Captain William Flint as the Officer in Charge at the Moore County Detention Center. Plaintiff alleges that Captain Flint was deliberately indifferent to Plaintiff's allergies during his pretrial detention in May 2024, and that conditions at the jail were inadequate. Currently pending before the Court are Defendant's Motion for Summary Judgment [Doc. #36] and Defendant's Motion to Strike Surreply [Doc. #58]. For the reasons set out below, the Court will grant Defendant's Motion for Summary Judgment and will grant the Motion to Strike.[1]

## I. BACKGROUND

At the time of the alleged events, Plaintiff was a pretrial detainee at Moore County Detention Center ("MCDC"). The Complaint alleges that Plaintiff is allergic to corn, soy, and

[1] The Parties have consented to the referral of this case to a United States Magistrate Judge. (Joint Rule 26(f) Report [Doc. #14] at 3.)

wheat. (Compl. [Doc. #2] at 5.) However, Plaintiff later indicated in deposition testimony that he is not, in fact, allergic to soy, but rather he "do[es] not eat soy." (Ramos Dep. at 81:2.) Plaintiff was originally taken into MCDC custody in September 2023. It is undisputed that Plaintiff did not assert during his initial medical questionnaire and screening upon intake at MCDC that he had any known allergies, and he ate the provided food that contained his allergens for the first eight months at MCDC. (Ramos Dep. at 108:6-14; 141:4-9; 148:9-12; Ex. 4 to Ramos Dep. [Doc. #37-8]; Ex. 5 to Ramos Dep. [Doc. #37-9].) Plaintiff further did not mention any allergies or reactions to the food he was consuming to MCDC personnel. (Ramos Dep. at 83:18-20.) He did, however, speak with his ex-wife in September or October of 2023 about a rash that had started on his back. (Ramos Dep. at 80:23-81:25.) It was not until April of 2024 that Plaintiff recalled having an allergy test done in the past and requested that his ex-wife provide it to MCDC. (Ramos Dep. at 82:11-12.) According to the Complaint, on May 10, 2024, Plaintiff's ex-wife provided the jail with a record of a food panel test Plaintiff had undergone two years earlier, on May 18, 2022. (Compl. at 5.); (Ramos Dep. at 85:17-24.)

After his allergy test was provided to MCDC on May 10, 2024, Plaintiff began receiving a diet without dairy, corn, and soy, but "every meal had wheat in some form," so Plaintiff "refused all trays starting at lunch on the 11th." (Compl. at 5.) Plaintiff alleges that he saw a nurse on May 14, with Defendant present, but that Defendant and the nurse "were not certified dietician, nutritionist, or allergist." (Compl. at 5.) According to the Complaint, Defendant made the decision to assign Plaintiff regular trays without allergy restrictions, starting with dinner on May 14, 2024. (Compl. at 5.) Plaintiff continued to refuse all trays until May 17, when he spoke to his ex-wife and she encouraged him to eat. (Ramos Dep. at

117:25-118:13.) Plaintiff alleges that on May 17, he ate his "first tray in almost a week" and experienced throat swelling and bumps on his back. (Compl. at 5.) The throat swelling felt "like having the flu, like the severe runoff and everything gets swollen, but it wasn't the flu". (Ramos Dep. at 121:9-11.) He claims that he could still breathe, it just hurt, and this feeling of "being sick or com[ing] off the flu" then "slowly went away." (Ramos Dep at 121:7-8, 122:11-15.) That same night, Plaintiff alleges that he told two guards about his symptoms, who both said that they would notify the nurse. (Compl. at 5.) Plaintiff later submitted a sick call request and saw the nurse, after he had resumed eating the regular trays. (Compl. at 5.)

Following Plaintiff's resumption of eating the regular trays on May 17, 2024, Plaintiff ate the provided food until he was released on bond in October 2024.[2] (Ramos Dep. at 130:4-5.) He further reported that he did not experience any symptoms of an allergic reaction, other than the bumps on his back and a periodic runny nose, since returning to eating the regular trays. (Ramos Dep. at 123:1-9.) In orders Plaintiff received from the canteen that were placed December 8, 2023, January 19, 2024, and January 31, 2024, Plaintiff consumed several food items containing corn, wheat, and soy without reporting any reactions. (Ramos Dep. 157:4-160:10; Exs. 7, 8, 9 to Ramos Dep. [Doc. #37-11, #37-12, #37-13].)

In the Complaint, Plaintiff's primary claim is that he was "being fed food I'm allergic to, at CPT William Flint's order, after I provided my food allergies." (Compl. at 5.) Although not set out as separate claims, Plaintiff also raises general complaints regarding MCDC

---

[2] Plaintiff was arrested on new charges and returned to MCDC custody nearly a year later, in September 2025, and he has filed a separate case raising claims related to that later period, 1:25cv1061, which will be addressed separately in that case. (See also Order of October 6, 2025 [Doc. #27] noting that the present case relates to a prior period of detention in 2024.)

conditions. For example, Plaintiff alleges that the food served at MCDC is nutritionally inadequate because it is high in processed carbohydrates, with no dairy and with significant amounts of soy. (Compl. at 6.) As to prison conditions more generally, Plaintiff alleges that inmates receive no outdoor recreation time. (Compl. at 6.)[3] Plaintiff further alleges that there were not enough electronic tablets available, leading to a lack of mental stimulation because the television was far away in the day room, and he could not see it. (Compl. at 6.) Finally, Plaintiff alleges that MCDC staff disrupts sleep by distributing mail, canteen items, and razors "after lights out." (Compl. at 7.)

In response to Defendant's Motion for Summary Judgment, Plaintiff has filed a responsive brief [Doc. #52] and supporting affidavit [Doc. #47], as well as an affidavit from John Bass, another detainee from MCDC [Doc. #50]. As noted in a prior Order [Doc. #54], the Court received multiple envelopes containing responsive materials from Plaintiff, who stated that he sent his materials in three separate envelopes after he had an envelope returned to him due to insufficient postage. The Court deemed these materials as timely and has considered them as part of the briefing for the present Motion. In that prior Order, the Court cautioned that "no additional filings from Plaintiff in response to the Motion for Summary

---

[3] Plaintiff notes that he was moved between Blue Block (with 10 hours per week of indoor recreation time) and Yellow Block (with 6 hours a week of indoor recreation time). According to Defendant, Plaintiff was moved to a single cell in Yellow Block in May 2024 because of Plaintiff's self-imposed hunger strike and pursuant to MCDC policy to "eliminate the potential of his making a false claim that his cellmate was eating his food or something similar." (Flint Aff. [Doc. #37-19] at 9.) During has time at MCDC in 2023 and 2024, Plaintiff moved back and forth between Blue and Yellow Block; he started in Yellow Block from September to November 2023, was moved to Blue Block in November of 2023, was moved to Yellow Block in May 2024 when he refused the trays, and was moved back to Blue Block in June 2024 until his release in October 2024. (Compl. at 6; Ramos Dep. at 33:8-10.) Both Blue and Yellow Block are more controlled areas than general population, and Plaintiff was assigned there for his safety because he was, at the time, an active-duty Army officer facing ten felony charges involving sex offenses with a minor. He is not raising any claims in the present case regarding his placement. (Ramos Dep. 45:2-46:19.)

Judgment are authorized at this time." (Order [Doc. #54].) Even so, twenty-five days after Defendant filed his Reply, Plaintiff filed a "Reply to Defendant's Reply" [Doc. #57]. Defendant has filed a "Motion to Strike Surreply" [Doc. #58]. Plaintiff filed a Response entitled "Affidavit of Vincent Ramos" [Doc #60].

## II. MOTION TO STRIKE

Defendant moves to strike Plaintiff's "Reply to Defendant's Reply," as an unauthorized surreply. "The Rules of Practice and Procedure of the United States District Court for the Middle District of North Carolina only allow for the filing of a motion, a response to a motion, and a reply." DiPaulo v. Potter, 733 F. Supp. 2d 666, 670 (M.D.N.C. 2010) (citing Local Rules 7.3 & 56.1). "Parties do not have the right to file a surreply," and "[g]enerally, courts allow a party to file a surreply only when fairness dictates based on new arguments raised in the previous reply." Id.

Here, fairness does not dictate permitting the Surreply in response to new arguments because Plaintiff does not contend Defendant raised any new arguments in the Reply. Rather, Plaintiff states that Defendant's Reply "is a 15-page document repeating same points already addressed by Plaintiff's Response to Defendant's Motion for Summary Judgment," and Plaintiff explains that he "will address Defendant's repeated points again and add more facts that have present themself since February 2026." (Surreply [Doc. #57] at 1.) Given that Plaintiff only asserts that Defendant raised "repeated points," fairness does not dictate that Plaintiff be afforded the right to file a surreply. United States v. Falice, No. 1:04CV878, 2006 WL 2488391, at *7 (M.D.N.C. Aug. 25, 2006). Plaintiff has already had ample opportunity to address Defendant's "repeated" arguments, and the Court previously clarified that Plaintiff's

Response [Doc. #52] and Affidavits [Docs. #47, #50] would be considered as part of the Court's summary judgment analysis. (Order [Doc. #54] at 2.) The Court also clearly noted in its prior Order, that "no additional filings from Plaintiff in response to the Motion for Summary Judgment are authorized at this time." (Order [Doc. #54] at 2.) In his Response to Defendant's Motion to Strike, Plaintiff states, "I don't have a copy of my Reply, yet I'm sure that I stated that some points was just part of the defendant's reply. . . . However, most of my reply was around more details of evidence I have presented before." (Response [Doc #60] at 2.) Thus, Plaintiff appears to confirm that the Surreply is largely just more details of the same matters already raised. Fairness does not dictate that the Surreply be considered. Thus, the Motion to Strike will be granted.[4]

## III. MOTION FOR SUMMARY JUDGMENT

Summary judgment is appropriate when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if the evidence presented could lead a reasonable fact-finder to return a verdict in favor of the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A court considering a motion for summary judgment must view all facts and draw all reasonable inferences from the evidence before it in the light most favorable to the non-

[4] The Court notes that the purported "new" facts presented in the Surreply would not alter this Court's analysis. The "Affidavit of Lower Blue Block" (Surreply [Doc. #57] at 12-14) merely repeats information already before the Court from Plaintiff's previous filings. The most recent "Affidavit of Vincent Ramos" discusses filed kitchen grievances and new allegations of issues related to his recent placement in Red Block, which were not alleged in the Complaint (and, thus, will not be considered here). (Surreply at 15-18.) Indeed, it appears that most if not all of the matters raised in the Surreply relate to Plaintiff's claims of new issues after he was detained in September 2025, more than a year after the issues raised in the present case. Thus, even if considered, the Surreply would not change any of the analysis here or the outcome on the Motion for Summary Judgment. To the extent Plaintiff seeks to raise new claims or issues related to his claims in 1:25cv1061, he would need to file an amended complaint in that case.

moving party. Carter v. Fleming, 879 F.3d 132, 139 (4th Cir. 2018) (citation omitted). The proponent of summary judgment "bears the initial burden of pointing to the absence of a genuine issue of material fact." Temkin v. Frederick Cnty. Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)). If the movant carries this burden, then the burden "shifts to the non-moving party to come forward with facts sufficient to create a triable issue of fact." Id. at 718-19 (citing Anderson, 477 U.S. at 247-48). A "mere scintilla of evidence" supporting the non-moving party's case is insufficient to defeat a motion for summary judgment. Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994); see also Anderson, 477 U.S. at 248 (noting that a non-moving party may not rest upon mere allegations or denials).

A. Deliberate Indifference to Alleged Allergies

Because of his status as a pretrial detainee, Plaintiff's claim of deliberate indifference to his medical needs would be evaluated under the Due Process Clause of the Fourteenth Amendment rather than under the Eight Amendment standard applicable to convicted prisoners. Short v. Hartman, 87 F.4th 593, 611 (4th Cir. 2023). "To state a claim for deliberate indifference to a medical need, the specific type of deliberate indifference claim at issue in this case, a pretrial detainee must plead that (1) they had a medical condition or injury that posed a substantial risk of serious harm; (2) the defendant intentionally, knowingly, or recklessly acted or failed to act to appropriately address the risk that the condition posed; (3) the defendant knew or should have known (a) that the detainee had that condition and (b) that the defendant's action or inaction posed an unjustifiably high risk of harm; and (4) as a result, the detainee was harmed." Id. at 611. Under this test, a plaintiff must at least present sufficient

evidence to establish that the defendant acted or failed to act "in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known." Id.; Farmer v. Brennan, 511 U.S. 825, 836 (1994). "It is still not enough for the plaintiff to allege that the defendant negligently or accidentally failed to do right by the detainee. Negligence was not enough before, and it is not enough now." Short, 87 F.4th at 611-12 (internal citations omitted). Moreover, to satisfy the first prong, whether under the Fourteenth Amendment or the Eighth Amendment, a plaintiff must present sufficient evidence of an objectively serious medical condition that posed a substantial risk of serious harm. Id. "A condition is objectively serious if it is 'diagnosed by a physician as mandating treatment' or is 'so obvious that even a lay person would easily recognize the necessity for a doctor's attention.' " Id. at 612 (quoting Scinto v. Stansberry, 841 F.3d 219, 225 (4th Cir. 2016)).

In this case, Plaintiff has failed to present evidence that his alleged allergies created an objectively serious medical need. Plaintiff concedes that he has not been diagnosed by a physician with any food allergy that mandated treatment. (Ramos Dep. at 95:14-19.)[5] Plaintiff relies on the food panel report from 2022 that seems to indicate only a minor potential reaction to some foods, and that does not include any opinion or interpretation by any physician, and Plaintiff concedes that he never followed up on that test or obtained any further opinion from a physician, dietician, or immunologist. (Ramos Dep. at 94:8-14.) In contrast, Defendant has obtained an opinion from a board-certified allergist/immunologist, who confirmed that

[5] Notably, Plaintiff was released from pretrial detention in October 2024 and was out of custody for almost the entirety of the discovery period, which began in April 2025, until he was re-arrested in September 2025, so Plaintiff had the opportunity to obtain other allergy testing or opinions had he chosen to do so.

Plaintiff does not have food allergies. (See Report of Dr. Leslie M. Cristiano, M.D. ("Cristiano Report") [Doc. #37-24].) Dr. Cristiano reviewed Plaintiff's medical records and the food panel report from 2022, and concluded that Plaintiff did not have any food allergies. Thus, there is no evidence that he had an objectively serious medical condition that was diagnosed by a physician. In addition, there is no evidence that he had an objectively serious medical condition that would have been so obvious that a lay person would recognize it. It is undisputed that Plaintiff did not report any allergies when he was booked into MCDC, and he ate the standard food trays for eight months without reporting any allergy symptoms. (Ramos Dep. at 108:6-11; 141:4-8; 148:9-10.) Plaintiff also ate snacks from the canteen containing corn and wheat without any adverse reactions. (Ramos Dep. at 108:6-14; Exs. 7, 8, 9 to Ramos Dep. [Doc. #37-11, #37-12, #37-13].) Plaintiff also did not display or report any symptoms of an allergic reaction on May 11, when he ate everything except for the bread on his tray. (Ramos Dep. at 102:7-9.) Thus, there is no evidence that he had an objectively serious medical condition that was diagnosed by a physician or that would have been so obvious that a lay person would recognize it.

A few days later, on May 17, Plaintiff broke his fast and ate a regular tray, and reported experiencing throat swelling many hours later, but Plaintiff testified that he "could breathe, it just hurt. Like it was like having the – the flu, like the severe runoff and everything gets swollen, but it wasn't the flu," and that "it felt like it was going like – you know when you come off from being sick or come off the flu, it slowly went away." (Ramos. Dep. at 121:7-11, 122:12-15.) Plaintiff continued to eat the regular trays after May 17 without further issues, and Plaintiff's only other alleged allergy symptom was an acne-like rash on his back. Plaintiff

has not presented any evidence or opinion to connect the rash to any purported food allergy, and Defendant conceded that when he showed it to the nurse, she did not attribute the rash to his diet, and instead said it "could be the shower, it could be the soap." (Ramos Dep. 134:9-19.) Moreover, Defendant's expert, Dr. Cristiano, reviewed Plaintiff's records and opined that the rash reported by Plaintiff was "clearly not a sign of food allergy." (Cristiano Report [Doc. #37-24] at 5-6.)[6] Plaintiff continued to eat the regular trays, and conceded that he did not seek any further medical treatment for the rash or the alleged allergy after his release in October 2024. (Ramos Dep. at 177:10-18, 151:24-152:5.)

Thus, for the period through his release in October 2024, Plaintiff has not presented sufficient evidence from which a jury could find that his alleged allergies constituted a serious medical condition that posed a substantial risk of serious harm.

Moreover, Plaintiff has not presented sufficient evidence from which a reasonable jury could find that Defendant Flint intentionally, knowingly, or recklessly acted or failed to act to appropriately address the condition, or that Defendant Flint knew or should have known of the condition and that his action or inaction posed an unjustifiably high risk of harm. As noted above, it is undisputed that Plaintiff did not report any allergies on his intake questionnaire, and he ate the regular trays for eight months without reporting any symptoms of an allergic reaction to MCDC personnel. (Ramos Dep. at 108:6-11.) Plaintiff nevertheless contends that Defendant Flint was deliberately indifferent to his serious medical condition

---

[6] Notably, "courts have found that a rash does not constitute an objectively serious medical need." Keen v. Wexford Med., No. 7:24-CV-00067, 2025 WL 928845, at *4 (W.D. Va. Mar. 27, 2025) (collecting cases); see also Gonzalez-Reyna v. Ellis, No. 1:09CV522 AJT/TCB, 2009 WL 2421482, at *3 (E.D. Va. July 27, 2009) ("[I]t is doubtful that a skin rash, even one which causes pain and itching, is a sufficiently serious medical need" to support a constitutional violation).

based on a meeting on May 14, 2024, three days into Plaintiff refusing trays. (Compl. at 5.) Plaintiff explains that on May 14, he was taken to the medical office to meet with Defendant Flint and the Nurse. Plaintiff told Defendant Flint and Nurse Guadalupe about his 2022 food panel testing, which he had "forgotten." According to Defendant Flint, Plaintiff could not explain why he had eaten these foods, including orders from the canteen, without reaction, and could not point to any medical determination of a food allergy. Defendant Flint's Affidavit states that "[Plaintiff] having knowingly and voluntarily eaten foods to which he claimed to be allergic – corn, wheat, peanuts, and soy – and having no adverse reactions from doing so, strongly suggested that he was not allergic or otherwise sensitive to these foods." (Flint Aff. [Doc. #37-19] at 8.) In his Affidavit, Defendant Flint notes that "[i]n the absence of a diagnosis by a certified medical professional that the inmate should be placed on a modified diet for medical reasons, we cannot modify an inmate's diet based solely on that inmate's word or ambiguous medical records that do not make it clear that the inmate should be placed on a modified diet. To do otherwise would allow inmates to be able to dictate what foods they eat, which in turn would create an untenable administrative and logistical nightmare in trying to feed over 150 inmates, each with the individual diet of their choice, and would create a dangerous environment of jealousy and resentment among the inmate population, as inmates would perceive that other inmates were receiving more or better food than they were getting." (Flint Aff. [Doc. #37-19] at 9.) For her part, Nurse Guadalupe has provided an affidavit noting that the allergy testing provided by Plaintiff was not a diagnosis of any food allergy, that none of Plaintiff's records reflected any diagnosis of a food allergy, and that Plaintiff's history of eating standard trays and canteen orders containing peanuts, corn, soy,

and wheat indicated that he was not allergic to those items. (Guadalupe Aff. [Doc. #37-23] ¶ 6-7.) Nurse Guadalupe noted that she did not observe any allergic reactions, and that during the meeting Plaintiff was "highly confrontational and obnoxious" and "was asking for a custom diet made just for him consisting of chicken or turkey, eggs, and potatoes." (Guadalupe Aff. [Doc. #37-23] ¶ 8.) According to Nurse Guadalupe, Plaintiff acknowledged he had eaten items from the canteen orders containing corn, wheat, soy and peanuts, and that he had not reported any adverse reaction to those items or to the standard trays. (Guadalupe Aff. [Doc. #37-23] ¶ 8.) Based on all of that information, Nurse Guadalupe concluded that "it did not appear that he had any actual food allergies or significant sensitivities to the foods in the standard menu served to inmates." (Guadalupe Aff. [Doc. #37-23] ¶ 9.) Plaintiff does not dispute this account, and concedes that during the meeting he was "an asshole" and got into a "heated argument" with Defendant Flint and then "walked out." (Ramos Dep. at 127:11-129:25.) Plaintiff contends that Defendant Flint was not "a dietitian, a nutritionist or a medical professional," and therefore should not have been making the decision, but as noted above, Defendant Flint agrees that he would not modify an inmate's diet "[i]n the absence of a diagnosis by a certified medical professional that the inmate should be placed on a modified diet for medical reasons," (Flint Aff. [Doc. #37-19] at 9), and Plaintiff concedes that he has not obtained any actual medical diagnosis or determination that he should be placed on a modified diet (Ramos Dep. at 150:6-152:5).

Thus, Plaintiff has not presented evidence of a serious medical need that Defendant Flint was deliberately indifferent to, particularly when Plaintiff himself did not treat it as such throughout the duration of his pre-trial detention at MCDC up to his release in October 2024.

See also Witschi v. N.C. Dep't of Pub. Safety, No. 1:14-cv-68-FDW, 2014 WL 3735135, at *2 (W.D.N.C. July 29, 2014) (holding that inmate's allergy to oats and soy did not constitute a serious medical need, and that while "Plaintiff is plainly unsatisfied with the diet he is being fed while at Mountain View, . . . the Constitution does not entitle Plaintiff to receive the diet of his choice"); see also Davis v. Short, No. 7:25-CV-00204, 2026 WL 2280686, at *2 (W.D. Va. Aug. 7, 2026) ("[A] prison official's failure to accommodate a medically recognized food allergy, without more, does not violate an inmate's constitutional rights" where the allergies do not "prevent the inmate from receiving a safe or nutritionally adequate diet."). Rather, Plaintiff himself states that he "forgot" about any allergies and did not report any allergies to the nurse upon intake at MCDC because he did not remember that he had an allergy test, he ate the standard tray including foods that he was supposedly allergic to, and he often ate foods from the canteen containing his reported allergens. (Ramos Dep. at 82:11-12; 108:6-14; 141:4-19; 148:9-10.) This persisted until his ex-wife delivered his 2022 food panel report from a year before his time at MCDC and, even following his self-imposed fast, he continued to eat foods he was supposedly allergic to. (Ramos Dep. at 130:4-5.) Thus, even taking the evidence in the light most favorable to Plaintiff, no reasonable jury could find that Plaintiff had a medical condition that posed a substantial risk of serious harm or that Defendant Flint knew or should have known that his action or inaction posed an unjustifiably high risk of harm. Defendant is therefore entitled to summary judgment on this issue.[7]

---

[7] This analysis relates to Plaintiff's claims regarding the May 2024 determination, through his release in October 2024. As noted above, Plaintiff was re-arrested in September 2025, and has brought separate claims for that time period in 1:25cv1061. The Court notes that as to this later time period, Defendant has presented the affidavit of Nurse Lantz, stating that on admission in September 2025, Plaintiff reported food allergies, and an October 2025 food panel profile reflected very low level sensitivity to wheat and peanuts, and higher sensitivity to shrimp and scallops. (Lantz Aff. [Doc. #37-22] ¶ 7.) Shrimp, scallops, and peanuts are not served on MCDC

B. Conditions of Confinement

It is not clear that Plaintiff actually raises any other claims in the present Complaint. Nevertheless, because his Complaint includes allegations regarding conditions of confinement, the Court considers those contentions as well.

For pretrial detainees in state custody, the Due Process Clause of the Fourteenth Amendment governs the conditions of confinement, as "a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law." Bell v. Wolfish, 441 U.S. 520, 535 (1979).

> Once the Government has exercised its conceded authority to detain a person pending trial, it obviously is entitled to employ devices that are calculated to effectuate this detention. Traditionally, this has meant confinement in a facility which . . . results in restricting the movement of a detainee in a manner in which he would not be restricted if he simply were free to walk the streets pending trial. Whether it be called a jail, a prison, or a custodial center, the purpose of the facility is to detain. Loss of freedom of choice and privacy are inherent incidents of confinement in such a facility. And the fact that such detention interferes with the detainee's understandable desire to live as comfortably as possible and with as little restraint as possible during confinement does not convert the conditions or restrictions of detention into "punishment."
>
> . . . .
>
> [I]f a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment." Conversely, if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees qua detainees. Courts must be mindful that these inquiries spring from constitutional requirements and that

---

trays, but out of an abundance of caution, Plaintiff was placed on a gluten-restricted diet, so he now receives trays the minimize foods containing gluten. (Lantz Aff. [Doc. #37-22 ¶ 7]; Flint Aff. [Doc. #37-19] at 10.) Plaintiff nevertheless continues to obtain canteen items with peanuts and gluten. (Lantz Aff. [Doc. #37-22] ¶ 8; Flint Aff. [Doc. #37-19] at 11.) In addition, Dr. Cristiano considered this October 2025 testing, and still concluded that Plaintiff does not have a food allergy to corn, wheat, soy, or peanuts, based on the lack of any actual allergic reaction. (Cristiano Report [Doc. #37-24].)

judicial answers to them must reflect that fact rather than a court's idea of how best to operate a detention facility.

Bell, 441 U.S. at 536-37, 539 (internal citations omitted). Thus, "not every inconvenience encountered during pretrial detention amounts to 'punishment' in the constitutional sense." Martin v. Gentile, 849 F.2d 863, 870 (4th Cir. 1988). "In order to prevail on a substantive due process claim, the pretrial detainee must show that a particular restriction was either: '(1) imposed with an expressed intent to punish or (2) not reasonably related to a legitimate nonpunitive governmental objective, in which case an intent to punish may be inferred.'" Williamson v. Stirling, 912 F.3d 154, 174 (4th Cir. 2018) (quoting Slade v. Hampton Rds. Reg'l Jail, 407 F.3d 243, 251 (4th Cir. 2005)).

In addition, when the claim involves an alleged failure to protect from harm, the claim is one of objective indifference, and a pretrial detainee must show an objectively serious deprivation of basic human needs and "that the defendant's action or inaction was . . . objectively unreasonable, . . . that is, the plaintiff must show that the defendant should have known of that condition and that risk, and acted accordingly. Or as the Supreme Court put it when describing civil recklessness in [Farmer v. Brennan, 511 U.S. 825 (1994)], it is enough that the plaintiff show that the defendant acted or failed to act in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known." Short, 87 F.4th at 611 (internal quotation marks omitted).

1. Alleged Nutritionally Inadequate Food

"It is well-established that inmates must be provided nutritionally adequate food, 'prepared and served under conditions which do not present an immediate danger to the health

and well-being of the inmates who consume it.'" Shrader v. White, 761 F.2d 975, 986 (4th Cir. 1985) (citation omitted).

Plaintiff has alleged nutritional inadequacies in the food he was provided at MCDC but has done little more than provide caloric estimations of his meals. (Pl.'s Br. [Doc #52] at 4.) It is not clear that these contentions even relate at all to the standard trays he received prior to his release in October 2024. Moreover, such conclusory statements fall short of the requirements that Plaintiff provide some evidence in the record to support his claim. Fed. R. Civ. P. 56(c). In contrast, sworn affidavits from Serena Smedley, the Food Services Director at MCDC employed by third-party contractor Aramark Correctional Services, LLC ("Aramark"), and Julia Dunnigan, the Nutrition and Operational Support Senior Manager for Aramark, state that the daily menus at MCDC meet the State of North Carolina's, the American Correctional Association's, and the National Academy of Sciences' requirements, providing an average of 2,600 calories a day with proper vitamins, minerals, and protein content. (Smedley Aff. [Doc. #37-20] ¶¶ 8-9; Dunnigan Aff. [Doc. #37-21] ¶ 6.) Plaintiff has not presented any evidence to create a genuine issue of material fact on this point. As noted above, it is not clear that Plaintiff's assertions even relate to the standard trays he received during the relevant period. Moreover, Plaintiff's assertions are, by his own admission, simply guesses as to the calories. "[J]udges are not 'required to submit a question to a jury merely because some evidence has been introduced by the party having the burden of proof, unless the evidence be of such a character that it would warrant the jury in finding a verdict in favor of that party.'" Nyuwa v. Bissonnette, No. 1:04 CV 00823, 2005 WL 2136949, at *2 (M.D.N.C.

Aug. 31, 2005) (quoting Anderson, 477 U.S. at 251). Plaintiff's conclusory statements are not sufficient to create a genuine issue of material fact.

Plaintiff further notes in his Complaint that the diet is soy-laden, which he contends is harmful to his health. (Compl. at 6.) Nonetheless, numerous courts have rejected claims that soy-based diets pose a risk to prisoners' health that amount to a constitutional violation. See Kinser v. Pszczolkowski, No. 1:16CV8, 2016 WL 11268257, at *12 (N.D. W. Va. Oct. 19, 2016) (collecting cases). To the extent Plaintiff's claims relate to allegations that he should have been provided with a specialized diet, those claims are addressed above, and Plaintiff has failed to present evidence of a serious medical condition or objective indifference to that condition. Further, Plaintiff's summaries of the meal trays appear to actually reflect balanced meals, albeit with some items he might choose not to eat. The supporting affidavit from another detainee who worked in the kitchen, John Bass, is even more transparent, complaining that he has "never heard an inmate say they like the food here" and complaining that the cake provided on the trays rarely has frosting. (Bass Aff. [Doc. #50] at ¶ 8.) These complaints do not rise to the level of a constitutional violation.

Finally, Plaintiff's allegation that the food at MCDC is not approved by a registered nutritionist or dietician is baseless, as Julia Dunnigan affirmed that she is a licensed dietician and serves as a manager of Aramark, the company that provides MCDC's food service. (Dunnigan Aff. at 1 [Doc. #37-21].) Thus, Plaintiff's contention that the food he was served at MCDC was nutritionally inadequate fails.

2. Alleged Inadequate Recreation and Exercise Time

Plaintiff's allegations that he was provided with inadequate recreation and exercise time and was prevented from going outside do not constitute Fourteenth Amendment violations. A detention facility may not "depriv[e] inmates of all meaningful opportunities to exercise." Mitchell v. Rice, 954 F.2d 187, 193 (4th Cir. 1992). However, "[t]he Fourth Circuit has found that there is no Constitutional violation when inmates have access to indoor room and are encouraged to use such room for exercise and physical activity." Allen v. Johnson, No. 3:09CV7-03-MU, 2009 WL 102541, at *2 (W.D.N.C. Jan. 13, 2009) (citing Clay v. Miller, 626 F.2d 345, 347 (4th Cir. 1980)). In addition, "[i]t is well settled that jails may provide space for indoor exercise and recreation as an alternative to outdoor recreational facilities, absent medical evidence demonstrating a need for outdoor exercise." Jones v. Kelly, 900 F.2d 252, at *1 (4th Cir. 1990) (unpublished table decision); see also Mitchell, 954 F.2d at 191 n.4 (declining to "make a distinction here between indoor and outdoor exercise opportunities"); Parnell v. Waldrep, 511 F. Supp. 764, 771 (W.D.N.C. 1981) ("[P]rovided that inmates at the Gaston County Jail are afforded the opportunity for adequate indoor exercise, the court will not require that the jail also provide special facilities for outdoor recreation.").

In this case, Plaintiff had opportunities for recreation time outside his cell, at least six hours per week, in two-hour blocks three days a week in Yellow Block, and in two-hour blocks five days a week in Blue Block. (Ramos Dep. at 32:16-25; Ramos Aff. [Doc. #47] at 3.) Thus, Plaintiff had opportunities to exercise in the common room, although he chose not because he believed his cell was cleaner and because he did not want to sweat through his clothes during this allotted time. (Ramos Dep. at 34:1-8.) Plaintiff also had the ability to exercise in

his cell. (Ramos Dep. at 34:14.) Plaintiff complains that he sometimes had less floor space to exercise inside his cell due to an additional cellmate, but he still exercised in his cell and still had at least six hours a week of potential exercise time outside of his cell. (Ramos Dep. at 32:16-25; 34:1-15.) Thus, Plaintiff was not deprived of all meaningful opportunities to exercise, and the fact that these opportunities were not at Plaintiff's preferred location on a schedule of his choosing does not amount to a constitutional violation. Daniels v. Benston, No. 5:13-CT-3286-FL, 2016 WL 270218, at *6 (E.D.N.C. Jan. 21, 2016) ("During this time period [the] plaintiff [is] a detainee at a jail, not a guest in a hotel, and it should be expected that conditions in such a setting are often times less than ideal."), aff'd, 668 F. App'x 447 (4th Cir. 2016). Moreover, Plaintiff has not alleged that the limitations on recreation time in Blue Block or Yellow Block were imposed as punishment or were not reasonably related to a legitimate nonpunitive government objective, and there is no basis to find a Fourteenth Amendment violation on the facts alleged.[8]

3. Cell Size

Plaintiff also complains about the size of the cells. However, Plaintiff's cells in both Blue Block and Yellow Block were not unconstitutionally small or overcrowded. Although a violation of state regulations does not necessarily rise to the level of a constitutional violation,

---

[8] Plaintiff also testified that he was "not going outside at all" and "[n]ot being able to see direct sunlight" because he was not permitted any outdoor recreation time. (Ramos Dep. at 23:24-24:11.) Although Plaintiff has not had opportunities for *outdoor* exercise, he has had sufficient opportunities for indoor exercise, and as discussed above, the Fourth Circuit does not make a distinction between indoor and outdoor exercise opportunities. Jones, 900 F.2d 252, at *1; see also Mitchell, 954 F.2d at 191 n.4. Moreover, Plaintiff has not produced evidence that his lack of access to sunlight has resulted in any medical issue. (Ramos Dep. at 71:19-25; 96:5-23.) Thus, Plaintiff's lack of exposure to the outdoors does not amount to a constitutional violation when he had other adequate exercise opportunities.

Defendant here contends that there is no constitutional violation where the cells were all sufficient under state law. The North Carolina Administrative Code states that single occupancy cells in county jails must have a minimum floor space of 50 square feet and a minimum floor dimension of seven feet. 10A N.C. Admin. Code 14J.1223. Plaintiff alleges in his Complaint that his cell is nine cinder blocks deep and five and a half cinder blocks wide, though he admits in his deposition that this is an estimate.[9] (Compl. at 6.); (Ramos Dep. at 42:7-15.) Defendant's affidavit affirms that Plaintiff's cells measured 7.4 feet wide by 12 feet long. (Flint Aff. [Doc. #37-19] at 12.) This measurement applied for both Plaintiff's cell in Blue Block and in Yellow Block, measuring 88.8 square feet. (Flint Aff. [Doc. #37-19] at 12.) This exceeds the required minimum floor space of 50 square feet and a minimum floor dimension of seven feet under the North Carolina Administrative Code. 10A N.C. Admin. Code 14J.1223.

Plaintiff further alleged that his cells were unconstitutionally small when he had a roommate sleeping in a boat[10] on the floor. (Compl. at 6.) However, "[d]ouble or triple celling of inmates is not *per se* unconstitutional." Williams v. Griffin, 952 F.2d 820, 824 (4th Cir. 1991). The North Carolina Administrative Code is illustrative on this point as well. It states that each multiple occupancy cell "shall house no more than four inmates" and must have "a minimum floor space of 50 square feet for the first inmate and 35 square feet of floor space

---

[9] In Plaintiff's Deposition, he indicated that he remembered his measurements to be 21 feet by 8 feet. (Ramos Dep. at 41:13.) However, he also stated that he could lay across his cell, and, the long way, almost two mattresses would fit. (Ramos Dep. at 41:14-16.) He then estimated a mattress to be six to seven feet. (Ramos Dep. at 41:16-17.) Thus, Plaintiff's estimates would place the size of his cell anywhere from 96 square feet to 168 square feet.

[10] Plaintiff defined a "boat" as a plastic frame with a mattress in it that another individual would sleep in on the floor of the cell. (Ramos Dep. at 31:15-16.)

for each additional inmate." 10A N.C. Admin. Code 14J.1224. For Plaintiff and his roommate, the cell must have been at least 85 square feet according to the Code. His cell satisfied this requirement, measuring 88.8 square feet.

Plaintiff claims that during his time in Blue Block, which had bunks, he periodically had an additional third roommate who slept on the floor in a boat. (Ramos Dep. at 33:11-13; 44:16-18.) However, he has not specified how often or how long this occurred, and from his contentions it appears to have been only brief and occasional. It is possible that adding a third roommate could raise concerns, particularly if imposed on an extended basis. However, the Fourth Circuit and the United States Supreme Court have found cells that measured less than 85 square feet to be constitutional. See Crowe v. Leeke, 540 F.2d 740, 741-42 (4th Cir. 1976) (no constitutional violation where three prisoners were housed in cells "approximately ten feet long and seven feet wide," or 70 square feet); Bell, 441 U.S. 520 at 541-42 (holding that double-bunking inmates in a cell that was designed for only one inmate with a total floor space of approximately 75 square feet to be constitutional as it did not rise to the level "as to cause them to endure genuine privations and hardship over an extended period of time."); see also Martinez v. Spartanburg Cnty. Det. Ctr., No. 9:23-01989-TMC-MHC, 2023 WL 6850242, at *4 (D.S.C. Sept. 12, 2023) (finding that four pretrial detainees housed in an 83-square-foot cell did not amount to a constitutional violation). In this case, Plaintiff has not presented evidence to establish that either the Blue Block or Yellow Block cells were so crowded during his detention in 2023-2024 as to amount to a constitutional violation. Switzer v. Thomas, No. 5:12cv00056, 2013 WL 693090, at *5 (W.D. Va. Feb. 25, 2013), report and recommendation

adopted, No. 5:12cv00056, 2013 WL 1145864 (W.D. Va. Mar. 19, 2013), aff'd, 535 F. App'x 312 (4th Cir. 2013).

Finally, Plaintiff does not contend that any overcrowding was intended as punishment or was not reasonably related to legitimate nonpunitive objectives. Thus, there is no genuine dispute of material fact regarding the constitutionality of Plaintiff's jail cells' size, and the Defendant is entitled to summary judgment on this issue.

4. Electronic Tablet Access

In the Complaint, Plaintiff also contends that, "[d]uring my time in Yellow Block . . . the MCDC didn't have enough tablets and with the TV so far away, . . . [it was] like being in the hole. No stimulus for the mind." (Compl. at 6.) However, "[d]enying access to a computer tablet does not inflict a sufficiently serious harm to deprive Plaintiff of life's minimal civilized necessities." Trent v. Honeycutt, No. 5:22-CV-000149-MR, 2022 WL 17404895, at *5 (W.D.N.C. Dec. 2, 2022). Further, "inmates [do] not have a right to access radios or tablet computers and denial of such devices does not constitute a violation of the Eighth Amendment or the Due Process Clause." Henderson v. Legal Entity DeKalb Cnty. Jail, No. 1:20-CV-4572-LMM, 2021 WL 11718584, at *1 (N.D. Ga. Jan. 14, 2021).

Here, Plaintiff does not contend that he was denied all access to a tablet, only that tablets were sometimes distributed in the afternoon rather than the morning, or had to be shared with a roommate or other individuals in the Block. (Ramos Dep. at 196:16-197:7, 198:11-199:11.) In addition, Plaintiff testified that he could have three books at a time and could change them out each week, providing him with mental stimulation. (Ramos Dep. at 52:16-17.) While disruptions to his tablet access may have led to boredom, he does not have

a constitutional right to either the tablet or to leisure materials of his choosing. Likewise, Plaintiff's contention that the television is too far away for him to read the subtitles, (Ramos Dep. at 196:7-13), does not amount to a constitutional violation. Plaintiff does not contend that the lack of tablet access or the distance of the television was imposed as punishment, or was not related to legitimate nonpunitive objectives. Thus, Defendant is entitled to summary judgment on this issue.

5. Sleep Disruption

Plaintiff alleges that MCDC's administrative process of distributing razors, mail, and canteen orders after 10:30 pm "lights out" disrupted his sleep. "Sleep is a basic human necessity, and conditions depriving inmates of sleep can support" a constitutional claim. Safrit v. Stanley, No. 22-6902, 2024 WL 414142, at *1 (4th Cir. Feb. 5, 2024) (citations omitted). Here, Plaintiff states that the distribution of canteen orders occurred once a week and razor distribution occurred twice a week, amounting to three nights a week of alleged sleep disruption. (Ramos Dep. at 61:19-62:2; 66:16-20.) However, Plaintiff does not contend that items were delivered at night as punishment, and Defendant Flint's Affidavit reflects that the method in which canteen orders, razors, and mail are distributed is a direct result of MCDC's other operational requirements. Specifically, Defendant states that distributions occur after lights out because the day shift staff are busy with other tasks, including ensuring that all inmates are fed three meals a day with trays properly disposed of, that inmates are prepared for and escorted to their court hearings, and that inmates are properly chaperoned to visitation meetings. (Flint Aff. [Doc. #37-19] at 14-15.) Further, the day shift staff are charged with escorting inmates for nurse visits, supervising inmates for their recreation time, and booking

and processing inmates. (Flint Aff. [Doc. #37-19] at 15.) Defendant Flint notes that making the deliveries at night helped to even out the workload. (Flint Aff. [Doc. #37-19] at 14-17.) Delivering razors and clippers was particularly time consuming, as officers had to wait for the inmate to shave and then take the razors or clippers back for safety reasons. (Flint Aff. [Doc. #37-19] at 14-17.) In addition, Defendant Flint noted that it was more difficult to make deliveries when inmates were out of their cells during the day. (Flint Aff. [Doc. #37-19] at 16-17.) Thus, Defendant has provided legitimate, nonpunitive reasons for making these late night deliveries.

In addition, Plaintiff has not presented this claim as a claim of deliberate indifference to a serious medical need. Plaintiff concedes that he did not suffer at the time, nor suffer later, serious mental or physical health issues resulting from the alleged sleep disruption. (Ramos Dep. at 70:1-71:25.)[11] Rather, Plaintiff indicated that, given his military background, he is trained and able to run on only four hours of sleep, but it is not something he "wants to do." (Ramos Dep. at 63:22-24.) In his Complaint he noted that staff only lightly knock on the door, if at all. (Compl. at 7.) Furthermore, Plaintiff noted in deposition testimony that he was able to nap during the day to catch up on any lost sleep. (Ramos Dep. at 67:18-25; 68:11-22.) Thus, Plaintiff's allegations do not rise to the level of unconstitutional conditions of confinement. See also Goolsby v. Cnty. of San Diego, No. 17CV564-WQH-NLS, 2019 WL 140792, at *3 (S.D. Cal. Jan. 8, 2019) (finding inmate failed to state a cognizable sleep

[11] Plaintiff indicated in Deposition testimony that while he attended behavioral health counseling and sleep therapy following his release from MCDC, he did so through the military's behavioral health process to ensure he was "okay coming out of [MCDC]." (Ramos Dep. at 70:1-71:25.) He further indicated that he attended sleep therapy but primarily for treatment of nightmares he experienced as a result of a prior traumatic event unrelated to his time at MCDC. (Ramos Dep. at 70:1-71:25.) He has not since been diagnosed with any mental health condition resulting from anything that happened in MCDC. (Ramos Dep. at 70:1-71:25.)

deprivation claim for a nightly razor drop off where the "procedures alleged in the complaint are incidental to incarceration, reasonably justified, and do not pose a substantial risk to an inmate's safety").

Whether Plaintiff believes that there is a better method available to distributing these products does not change this analysis. (Ramos Dep. at 65:4-10.) The Constitution does not require that MCDC provide the most optimal solution. It must only provide one that does not amount to punishment or result in an objectively serious deprivation of basic human needs.

> Since problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions, prison administrators should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.

Bell, 441 U.S. at 521. Thus, Defendant is entitled to summary judgment.

## IV. CONCLUSION

Taking all evidence in the light most favorable to Plaintiff, this Court finds that there are no genuine issues of material fact, and that Plaintiff has failed to present evidence from which a jury could find a constitutional violation, and Defendant is entitled to judgment as a matter of law.[12]

---

[12] Because the Court concludes that Plaintiff did not establish a constitutional violation, the Court need not reach the issue of qualified immunity. However, the Court also notes that Defendant in his individual capacity would be entitled to qualified immunity in this circumstance. Qualified immunity shields government officials from money damages unless "the official violated a statutory or constitutional right" and "the right was 'clearly established' at the time of the challenged conduct." Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). A right is clearly established when "'the contours of a right are sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" Id. at 741 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). Thus, "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." Id. at 743. In this case, Plaintiff has not established a constitutional violation under the Fourteenth

IT IS THEREFORE ORDERED that Defendant's Motion to Strike Surreply [Doc. #58] is GRANTED.

IT IS FURTHER ORDERED that Defendant's Motion for Summary Judgment [Doc. #36] is GRANTED, and this case is dismissed.

This the 30th day of September, 2026.

Joi Elizabeth Peake
United States Magistrate Judge

---

Amendment, nor has he established that every reasonable official would have understood that the actions violated a constitutional right. Thus, Defendant would also be entitled to qualified immunity, and Plaintiff would not be able to recover damages from Defendant in Defendant's individual capacity.